# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

ORIX PUBLIC FINANCE, LLC,

       Plaintiff,

v.

       **MEMORANDUM OF LAW & ORDER**
       Civil File No. 11-3261 (MJD/LIB)

LAKE COUNTY, MINNESOTA; and
LAKE COUNTY HOUSING AND
REDEVELOPMENT AUTHORITY, MINNESOTA,

       Defendants.

Brent A. Lorentz, Justin H. Jenkins, and Michael A. Rosow, Winthrop & Weinstine, PA, Counsel for Plaintiff.

Alain M. Baudry, Maslon Edelman Borman & Brand, LLP, and Kenneth H. Bayliss, III and Cally R. Kjellberg, Quinlivan & Hughes, PA, Counsel for Defendants.

## I.     INTRODUCTION

This matter is before the Court on Plaintiff's Motion for Summary Judgment [Docket No. 61], Defendants' Motion for Summary Judgment [Docket No 63], and Plaintiff's Motion to Partially Exclude Opinion Testimony of R. Donald Keysser and Prohibit Supplementation [Docket No. 75].  The Court heard

oral argument on October 9, 2013.  Because the frustration of purpose doctrine

applies, the Court grants summary judgment to Defendants.

## II.     BACKGROUND

### A.     Factual Background

#### 1.     Lake County's Application for Funds from the Rural Utilities Service

In 2009, Defendant Lake County, Minnesota ("Lake County" or "the

County") learned that it was eligible to participate in a federal loan and grant

program that provides funding for the construction of broadband cable service

networks.  (Huddleston Decl. ¶¶ 1-2.)  The Broadband Initiatives Program,

available through the Rural Utilities Service ("RUS"), a division of the United

States Department of Agriculture, assists rural communities with broadband

project funding.  (Id. ¶ 2.)  Lake County applied for an RUS loan and grant.  (Id.

¶ 3.)  That first application was denied by RUS in February 2010 based on

concerns about technical feasibility.  (Id. ¶ 4.)

The County then applied for a second round of RUS funding and sought

$66 million in loans and grants.  (Huddleston Decl. ¶ 5.)  To obtain RUS funding,

the County had to meet certain requirements, including that the broadband

project ("Project") would be "'substantially completed' within two years of the

date of the issuance of the award and fully complete within three years of the date of the award." (Huddleston Decl., Ex. A, Notice of Funds Availability at 3826.) Also, to qualify for the RUS funding, the County had to provide local matching funds to cover certain expenses that could not be covered by the RUS loan and grant. (Huddleston Decl. ¶ 5.) Lake County was required to "include with the application evidence of all funding, other than the RUS award, necessary to support the project." (Notice of Funds Availability at 3827-28.)

RUS also required that Lake County prove to RUS that the Project was financially feasible. (Notice of Funds Availability at 3828.) If Lake County failed to obtain the local matching funds specified in its application or to fulfill any other pre-award condition, RUS would not disburse funds to Lake County and would withdraw the award. (Id. at 3833.)

In early 2010, Lake County submitted its second RUS application for a $56,413,705 loan and a $9,955,359 grant. (Huddleston Decl., Ex. B, Round 2 Application at 12-13.) The application stated that the County would satisfy the local matching fund requirement by issuing $3.5 million in revenue bonds. (Id. at 13.) Lake County decided to issue revenue bonds to avoid putting public

funds at risk: the revenue bonds would be repaid solely from subscription fees paid by users of the broadband network.  (Huddleston Decl. ¶ 7.)

On September 10, 2010, RUS formally notified Lake County that its application had been approved, subject to the County's satisfaction of RUS conditions contained in the Loan/Grant and Security Agreement between Lake County and RUS ("LGSA").  (Huddleston Decl. ¶ 8; Huddleston Decl., Ex. D, Award Letter; Huddleston Decl., Ex. C, LGSA.)  The award letter stated: "Please note that any proposed modifications to these legal agreements at this point may result in withdrawal of the offer by RUS." (Award Letter.)  Lake County accepted RUS's offer on September 14, 2010.  (Id.)

## 2.    The Loan/Grant and Security Agreement

Under the LGSA, RUS required the County to satisfy the following conditions, as determined by RUS in its sole discretion, in order to receive the approximately $66 million loan and grant: all legal matters incident to consummating the loan and grant shall be satisfactory to counsel for RUS  (LGSA § 4.1(a)); Lake County "shall enter into an indenture, in form and substance satisfactory to RUS, for the $3,500,000 pledged by [Lake County] toward this Project as required under Section 4.2(d), which indenture shall secure such funds

with a subordinate priority to the RUS on the Revenues of the

Telecommunications System" (id. § 4.1(j); id., Schedule 1, Art. IV(1)(a)); and Lake

County shall not incur additional indebtedness without prior written consent of

RUS, with certain limited exceptions (LGSA § 7.4).

### 3. Lake County Seeks Funding for the $3.5 Million Local Match

Once the County received its award letter from RUS, it began to seek

funding for the $3.5 million in local matching funds. (Huddleston Decl. ¶ 12.)

RUS provided the County a November 23, 2010 deadline to provide evidence

that it had matching funds in place. (Id.) The County retained Northland

Securities, Inc. ("NSI") to locate an investor willing to buy revenue bonds to fund

its local match. (Id.)

On November 12, 2010, NSI contacted Plaintiff ORIX Public Finance, LLC

("ORIX"), an investment group. (Huddleston Decl. ¶ 13; Rosow Aff., Ex. 22;

Bayliss Decl., Ex. E.) NSI represented that Lake County would receive

approximately $66 million from RUS and that it needed to obtain $5 million in

matching funds as a condition of the RUS loan. (Rosow Aff., Ex. 22; Dinan Aff.

¶¶ 2-3.) ORIX expressed interest, and, on November 15, 2010, NSI sent ORIX a

"pitch book," which included, among other things, a summary of the Project and a copy of the LGSA. (Huddleston Decl. ¶ 13; Bayliss Decl., Ex. A, Dinan Dep. 26.)

On November 22, 2010, Lake County's bond counsel sent ORIX's in-house counsel, John Dinan, a complete copy of the LGSA, which Dinan reviewed. (Bayliss Decl., Ex. D, Dep. Ex. 75; Bayliss Decl., Ex. A, Dinan Dep. 26, 68.) ORIX expressed its desire to purchase the revenue bonds. (Huddleston Decl. ¶ 13.)

### 4. Negotiation of the Bond Purchase Agreement

Lake County's bond counsel, attorneys at the Duluth law firm of Fryberger, Buchanan, Smith & Frederick, P.A., drafted the first version of the bond purchase agreement between the parties. (Skala Decl. ¶¶ 2-4; Maddy Decl. ¶ 2.) Mary Francis Skala was lead bond counsel and attorney Daniel Maddy assisted in the preparation of the agreement. (Skala Decl. ¶¶ 2-4; Maddy Decl. ¶ 2.) Maddy avers that he made the final revisions to the first draft of the bond purchase agreement. (Maddy Decl. ¶ 2; Second Rosow Aff., Ex. 1, Skala Dep. 10, 24.)

Skala and Maddy both aver that it is standard for bond purchase agreements to have conditions precedent to each party's obligation to close. (Skala Decl. ¶ 4; Maddy Decl. ¶ 3.) It is also standard that the purchaser be

entitled to waive the conditions precedent to its obligations to purchase the

bonds and that the seller be entitled to waive the conditions precedent to its

obligations to issue the bonds.  (Skala Decl. ¶ 4; Maddy Decl.¶ 3.)  The draft

agreement that Maddy used as a template for drafting contained a Section 3,

entitled "Conditions of the Purchase Obligation of Purchaser," which explicitly

provided that the obligations of the Purchaser to purchase the bonds "are subject

to . . . conditions, compliance with any of which may be waived . . . by the

Purchaser."  (Maddy Decl. ¶ 5; Maddy Decl., Ex. A.)  Maddy proceeded to draft

the reciprocal Section 4, relating to conditions precedent to the Issuer and

Borrower's obligations.  Maddy avers that he intended that the conditions

precedent to the Issuer and Borrower's obligation to sell the bonds in Section 4

would be waivable by the Issuer or Borrower, but he inadvertently made a

typographical error and provided that the conditions precedent to the Issuer's

and Borrower's obligations to close were waivable by the Purchaser, ORIX.

(Maddy Decl. ¶¶ 2, 5-6.)  Maddy declares that this error occurred because he cut

and pasted the entirety of Section 3 into the new Section 4 that governed the

conditions precedent to the closing obligations of the Issuer and Borrower.

(Maddy Decl. ¶ 5.)  However, Maddy neglected to change the identity of the

party that could waive the conditions from "Purchaser" to "Issuer and Borrower," as he should have.  (Id.)  Skala avers that the resulting waiver language in Section 4 is nonsensical.  (Skala Decl. ¶ 5.)

The language allowing ORIX to waive the Section 4 conditions precedent appeared in the first draft of the bond purchase agreement emailed by Skala to ORIX on November 17, 2010.  (Skala Decl. ¶¶ 6-8; Dinan Aff. ¶ 4; Rosow Aff., Ex. 25.)  At that time, there had been no negotiations between the Fryberger law firm and ORIX about the bond purchase agreement, including Section 4.  (Skala Decl. ¶ 7; Maddy Decl. ¶ 8.)  (See also Bayliss Decl., Ex. F, Nguyen Dep. 9-10; Bayliss Decl., Ex. G, Dep. Ex. 87; Bayliss Decl., Ex. A, Dinan Dep. 96.)

ORIX and Lake County's counsel then had negotiations over the telephone.  (Dinan Aff. ¶ 4.)  ORIX negotiated certain changes to Section 3 of the bond purchase agreement so that ORIX's performance would be conditioned on a number of conditions precedent.  (Id.)  On November 21, 2010, Lake County's counsel sent a new draft of the bond purchase agreement and a redline showing changes from the first draft.  (Dinan Aff. ¶ 4; Rosow Aff., Ex. 27.)

### 5.    Pari Passu Funding

The initial drafts of the bond purchase agreement provided that the County would issue the revenue bonds to ORIX at 12% interest and gave ORIX a security interest and right to receive revenue from the Project pari passu with the rights held by RUS.  (Huddleston Decl. ¶ 14; Skala Decl. ¶ 9.)  In late November 2010, RUS refused to approve the pari passu funding and extended the deadline to provide proof of matching funds to December 30, 2010. (Id.)  Because it could not obtain pari passu funding and the bonds would be subordinate to RUS's payment rights, ORIX required more favorable economic terms, including a 15% interest rate and a standby letter of credit from the Project's contractor that would replenish the debt service reserve in the amount of $1.5 million if there was a draw on the debt service reserve.  (Huddleston Decl. ¶ 15.)  These changes increased the size of the bond from $3,500,000 to $5,630,000.  (Skala Decl. ¶ 10.)

### 6.    Terms of the Final Bond Purchase Agreement

On December 21, 2010, Lake County, ORIX, and Defendant Lake County Housing and Redevelopment Authority ("LCHRA") (the entity that would issue the bonds) signed the final Bond Purchase Agreement ("BPA").  (Huddleston Decl. ¶ 16; Huddleston Decl., Ex. E, BPA.)

In relevant part, Section 3 of the BPA, which addresses the conditions precedent to ORIX's obligation to purchase the bonds, provides:

> Section 3. <u>Conditions of Purchase Obligation of Purchaser</u> [ORIX]. The obligation of the Purchaser to purchase and pay for the Bonds is subject to the following conditions, compliance with any of which may be waived or the time for performance extended by the Purchaser:
>
> (a) The Purchaser shall have been provided with an opportunity to review all contracts and other due diligence materials it deems necessary in conjunction with its decision to purchase the Bonds and such contracts and other due diligence materials are acceptable to the Purchaser.
>
> (b) At the Closing Date the Borrower [the County] shall have performed all of its obligations hereunder theretofore to have been performed, in all material respects.
>
> (c) At the Closing Date, there shall be delivered to the Purchaser and dated as of the Closing Date such opinions of bond counsel covering the validity of the Bonds in form and substance satisfactory to the Purchaser.  In rendering the above opinions, counsel may rely upon customary certificates.
>
> * * *
>
> (g) The Government has approved the first advance on the RUS Loan.
>
> (h) The issuance of the Bonds and the terms thereof have been approved by the Government acting through the RUS, if so required under the Loan/Grant Agreement.

In relevant part, Section 4 of the BPA, which addresses the conditions precedent to the County's obligation to sell the bonds, provides:

> Section 4. <u>Conditions of Obligation of Issuer</u>. The respective obligations of the Issuer [LCHRA] and Borrower [Lake County] to close the transactions described herein and to sell the Bonds to the Purchaser are subject to the following conditions, compliance with any of which may be waived or the time for performance extended by the Purchaser.
>
> (a) At the Closing Date, the Purchaser shall have performed all of its obligations hereunder theretofore to have been performed, in all material respects.
>
> (b) At the Closing Date, there shall be delivered to the Purchaser and dated as of the Closing Date such opinions of bond counsel covering the validity of the Bonds in form and substance satisfactory to the Purchaser.  In rendering the above opinions, counsel may rely upon customary certificates.
>
> * * *
>
> (d) All proceedings and related matters in connection with the authorization, issue, sale and delivery of the Bonds shall have been satisfactory to bond counsel, and such counsel shall have been furnished with such papers and information as they may have reasonably requested to enable them to pass upon the matters referred to in this Section 4.
>
> * * *
>
> (f) The Government has approved the first advance on the RUS Loan.

(g) The Purchaser has delivered the letter required pursuant to Section 8 of this Agreement.

Section 3 provides that ORIX will not have to perform under the BPA unless the listed conditions occur.  Section 4 provides that the County will not have to perform under the BPA unless the listed conditions occur.   However, as written, both sections provide that ORIX could waive performance of the conditions.  In other words, as written, ORIX can waive its own compliance with the requirements set forth by the County, such as the requirement that ORIX has performed all of its material obligations under the BPA.

### 7.     Submission of the BPA to RUS

The County submitted the BPA to RUS for approval at the end of December 2010.  (Skala Decl. ¶ 12.)

During the first three weeks of January, Lake County heard nothing directly from RUS regarding the BPA.  (Huddleston Decl. ¶ 17.)  However, RUS's local field representative communicated to Lake County that RUS had concerns with the BPA.  (Id.; Bayliss Decl., Ex. B, Fields Dep. 167.)

On January 14, 2011, at the request of Lake County Commissioner Paul Bergman, County Consultant Gary Fields provided an analysis of "the impact of Lake County providing the non-RUS funds instead of Northland/ORIX."  (Rosow

Aff., Ex. 20.)  Fields estimated that Lake County would save almost $4 million by using this funding method and "[w]hile this would create a very good return on [the County's] investment, it also increases [the County's] risk."  (Id.)  He opined that this funding structure "would help [the County] address some of RUS's other concerns."  (Id.)  Bergman avers that he took this action to begin exploring self-funding models in January so that the County could be prepared if the BPA was not approved by RUS.  (Bergman Decl. ¶¶ 2-3.)  Bergman did not have authority to change the County's funding mechanism previously approved by the County Board.  (Id. ¶ 3.)

On January 21, 2011, RUS emailed Lake County, stating:

We are still reviewing the subordinate bond proposal that Lake County submitted to determine if it is acceptable and meets the award requirements.  Until we notify Lake County concerning our review of this proposal, it is recommended that you do not enter into any contracts at this time.

(Huddleston Decl., Ex. F.)  Lake County became concerned that the entire Project was at risk, so it requested that Senator Klobuchar's and Senator Franken's offices assist in determining the status of RUS final approval.  (Huddleston Decl. ¶¶18- 19.)  On January 26, 2011, aides for Senator Klobuchar and Senator Franken told the County that RUS had voiced significant concerns about the BPA

including the increase in the amount of the bonds to $5.6 million and the Project's ability to meet the increased debt service. (Huddleston Decl. ¶ 19; Huddleston Decl., Ex. G; Goutermont Decl. ¶ 3.) The aides suggested that RUS call the County to explain their concerns, and RUS agreed to do so. (Huddleston Decl., Ex. G.)

On January 31, 2011, Dinan wrote to Skala and asked about the drafting of the documents that would be necessary to close the transaction. (Skala Decl. ¶ 12; Skala Decl., Ex. B.) Skala responded: "At this time it is premature to begin drafting not having all the RUS pieces in place. In addition, it is my understanding that RUS has questions about the BPA. I am unaware of the scope of the questions. I hope to hear more this week. We will keep you posted." (Skala Decl., Ex. B.) Also on January 31, County Administrator Matthew Huddleston completed another analysis of the County's available cash to assist in analyzing whether the County could self-fund the matching funds. (Rosow Aff, Ex. 14.)

### 8.    RUS's Rejection of the BPA

On February 2, 2011, the County participated in a telephone conference with RUS; participating were Lake County Administrator Matthew Huddleston,

Lake County Board Chair Rick Goutermont, Lake County bond counsel Mary Frances Skala, assistant bond counsel John Gasele, RUS Administrator Jonathan Adelstein, Director of RUS's Broadband Division Kenneth Kuchno, RUS legal counsel Gary Badway, and an aide from Senator Klobuchar's Office.  (See, e.g., Second Huddleston Decl., Ex. 1, Feb. 2, 2011 Email by Huddleston; Goutermont Decl. ¶ 4.)  RUS first wanted to discuss the subordinate revenue bond.  (Second Huddleston Decl., Ex. 1.)  The County told RUS that the Board was going to entertain a resolution on February 8 to use County reserves in place of the bond but that it still wanted to discuss the bond.  (Id.)  RUS attorney Badway stated that the BPA was unacceptable to RUS for many reasons including: the 15% interest rate was too high; the amount of the bond was more than the $3.5 million identified in the County's application; the amount of the bonds threatened the financial viability of the Project; the BPA would not close until after RUS funding; and the BPA called for payments through the general contractor by way of a line of credit, which RUS believed would give ORIX priority.  (Id.; Gasele Decl. ¶ 6; Huddleston Decl. ¶ 22; Skala Decl. ¶ 14; Goutermont Decl. ¶ 5.)  RUS stated that it was non-negotiable that it would not deviate from the $3.5 million funding amount stated in the County's application.  (Skala Decl. ¶ 15; Gasele

Decl. ¶ 9; Huddleston Decl. ¶ 23; Second Huddleston Decl., Ex. 1.)  RUS stated that "it would not negotiate" with Lake County concerning the BPA; that if the County proceeded with the BPA, RUS would formally not approve the loan; and that the County should "get funding elsewhere."  (Huddleston Decl. ¶ 24; Goutermont Decl. ¶ 6; Gasele Decl. ¶¶ 7-9; Skala Decl. ¶¶ 14-17.)  RUS did not formally reject the BPA, which would have consisted of RUS pulling Lake County's award.  (Rosow Aff., Ex. 3, Huddleston Dep. 118-19.)

Skala asked RUS to put its concerns in writing, but RUS refused. (Huddleston Decl. ¶ 25; Gasele Decl. ¶ 10; Skala Decl. ¶ 18.)  RUS refused to offer evidence in this case or allow its employees to testify, citing to federal regulations.  (Bayliss Decl., Ex. C.)  However, according to Skala, RUS did review and approve a letter from Skala to ORIX, dated on April 15, 2011, which stated: "The Issuer and Borrower provided the Bond Purchase Agreement to the RUS staff for review in good faith.  In informal discussions, the RUS staff indicated that if the Bond Purchase Agreement were formally submitted, the RUS would reject, in full cloth, the transaction described in the Bond Purchase Agreement as a means of providing the Matching Funds, resulting in the loss of the Loan and the Grant."  (Skala Decl. ¶ 20; Skala Decl., Ex. C.)

### 9. Lake County's Decision to Self-Fund

After RUS stated that it would deny the loan if the County proceeded with the BPA, the County decided that it could not fund the Project through revenue bonds. (Huddleston Decl. ¶ 26; Goutermont Decl. ¶ 7; Skala Decl. ¶ 19.) If it proceeded with the BPA, there would be no funds from RUS to build the Project and, thus, no revenues to repay the bonds. (Id.)

On February 8, 2011, the Lake County Board authorized using $3.5 million of County reserves to meet the local match requirement. (Huddleston Decl. ¶ 26; Huddleston Decl., Ex. I, Feb. 8, 2011 County Board Minutes; Goutermont Decl. ¶ 7.) That afternoon, the County informed RUS of this action. (Rosow Aff., Ex. 16.) The County also issued a press release that day, stating its decision to self-fund; however, the County did not inform ORIX before issuing the press release. (Dinan Aff. ¶ 8)

ORIX read the press release and requested a conference call with Lake County. (Rosow Aff., Ex. 24; Dinan Aff. ¶ 8; Gupta Aff. ¶ 3.) During the February 10, 2010 conference call, Lake County confirmed that it did not intend to issue the bonds to fund the Project. (Dinan Aff. ¶ 8.)

On February 23, 2011, Skala sent ORIX a letter which stated that Lake County was not in a position to perform the BPA. (Skala Decl. ¶ 20; Second

Skala Decl., Ex. 1.)  On April 15, 2011, Skala sent ORIX a revised letter, which had been reviewed and approved by RUS, stating the same.  (Skala Decl. ¶ 20; Skala Decl., Ex. C.)

As of September 2012, the County and RUS had commenced the Project, and RUS has approved the first advance of the RUS loan and grant.  (Rosow Aff., Ex. 3, Huddleston Dep. 140-41.)

## B.     Procedural History

Initially, ORIX filed a complaint against LCHRA and Lake County in Texas state court.  Defendants removed the case to federal court where it was dismissed for lack of personal jurisdiction.  <u>ORIX Pub. Fin., LLC v. Lake County Housing & Redevelopment</u>, Civil Action No. 3:11–CV–0678–D, 2011 WL 3628958 (N.D. Tex. Aug. 16, 2011).  On November 3, 2011, Plaintiff filed suit against the same Defendants in this Court.  Plaintiff then sought leave to amend its Complaint, which was granted.  The First Amended Complaint ("FAC") alleges Count One: Breach of Contract; and Count Two: Declaratory Judgment.

Plaintiff alleges that the BPA is an existing and enforceable contract and that Defendants anticipatorily and materially breached it by refusing to perform before performance was due.  (FAC ¶ 37.)  Additionally or alternatively, Plaintiff argues that it is entitled to a termination fee pursuant to § 11 of the BPA.  (<u>Id.</u> ¶

38.)  Plaintiff seeks a declaratory judgment determining whether Defendants

repudiated and/or breached the BPA, whether the BPA has been terminated, and

whether Plaintiff is entitled to a termination fee under Section 11 of the BPA.  (Id.

¶ 41.)

On November 1, 2012, the Court denied Defendants' motion to dismiss.

[Docket No. 53]  The parties have now filed cross motions for summary

judgment, and Plaintiff has also filed a <u>Daubert</u> motion.  ORIX requests that the

Court find that Lake County anticipatorily repudiated the BPA and is liable to

ORIX for damages of close to $5 million.  Defendants request that the Court

dismiss all of Plaintiff's claims and grant summary judgment in Defendants'

favor.

## III.    DISCUSSION

### A.    <u>Daubert</u> Motion

Plaintiff moves to have the Court exclude portions of the testimony of

Defendants' expert, R. Donald Keysser, an expert in public finance.  Because,

without considering or relying upon Keysser's opinion, the Court grants

summary judgment for Defendants, the Court need not address Plaintiff's

motion to exclude Keysser's testimony.

### B.    Plaintiff's Hearsay Objections

Before addressing the merits of the parties' summary judgment motions,

the Court must address Plaintiff's claim that key pieces of evidence relied upon

by Defendants are inadmissible hearsay.  Hearsay is an out-of-court statement

offered into evidence to prove the truth of the matter asserted in the statement.

Fed. R. Evid. 801(c).

### 1. RUS's Statement that It Would Deny the Loan and Grant if the County Proceeded with the BPA

ORIX argues that there is no admissible evidence that RUS rejected the

BPA during the February 2, 2011 telephone conference because RUS's statement

is hearsay.  The Court concludes that RUS's rejection of the BPA is not hearsay

and, even if it were, it is admissible under multiple hearsay exceptions.

### a) Non-hearsay Verbal Act

First, RUS's statement that it would not approve the BPA is admissible as a

verbal act.  Verbal acts, "in which the statement itself affects the legal rights of

the parties or is a circumstance bearing on conduct affecting their rights," are not

hearsay.  Mueller v. Abdnor, 972 F.2d 931, 937 (8th Cir. 1992) (citation omitted).

> A verbal act is an utterance of an operative fact that gives rise to
> legal consequences.  Verbal acts, also known as statements of legal
> consequence, are not hearsay, because the statement is admitted
> merely to show that it was actually made, not to prove the truth of
> what was asserted in it.  For example, the hearsay rule does not

exclude relevant evidence as to what the contracting parties said or wrote with respect to the making or the terms of an agreement.

Lorraine v. Markel American Ins. Co., 241 F.R.D. 534, 567 n.50 (D. Md. 2007).

Verbal acts "have relevance simply because they were made." Id. at 566.

RUS's statement that it would not approve the BPA was a nonhearsay verbal act – the statement has legal significance simply because it was made. See Brewer v. Am. Power Source, Inc., 517 F. Supp. 2d 881, 888, 888 n.3 (N.D. Miss. 2007), aff'd 291 Fed. App'x 656 (5th Cir. 2008). RUS's statement that it would not give approval to the BPA had legal significance – under the LGSA, in order for the Project to proceed, RUS had to approve the BPA. Also, under the BPA, RUS's approval of the BPA was a condition precedent to ORIX's obligation to perform, and RUS's release of the first loan amount, which was predicated upon RUS's approval of the BPA, was a condition precedent to both ORIX's and the County's obligations to perform. Simply because RUS did not "formally" reject the BPA and pull the award does not mean that this was an act without legal significance. The undisputed testimony is that RUS stated it would not negotiate with the County, would not approve the BPA, and would pull the award if the County continued with the BPA.

### b) Explanation for Why the County Did not Perform under the BPA

Furthermore, RUS's statement denying approval for the BPA is also not hearsay because it is also admitted to explain its effect on the County and why it acted as it did to self-fund.  See, e.g., Katzenmeier v. Blackpowder Prods., Inc., 628 F.3d 948, 951-52 (8th Cir. 2010) (holding out-of-court statements were not hearsay when they were not offered "for the truth of what the [third party] said, but rather to demonstrate the reasons for the [defendant's] [actions]").  The fact that RUS unequivocally stated that it would formally reject the BPA explains why the County was justified in repudiating the BPA and self-funding.  Thus, RUS's statement is not hearsay.

### c) RUS's Then-Existing State of Mind

Moreover, RUS's statement that it would not approve the BPA also falls within the exception to the hearsay rule for a "statement of the declarant's then-existing state of mind (such as motive, intent, or plan)."  Fed. R. Evid. 803(3).  This exception permits admission of a declarant's statement of intent to act a certain way in order to show RUS's intent.  See United States v. Barraza, 576 F.3d 798, 805 (8th Cir. 2009).  RUS's statement during the February 2, 2011 conference call that it would not approve the loan and grant if the County proceeded with

the BPA was contemporaneous with RUS's then-existing state of mind and is admissible to show RUS's intent.

### d) Residual Exception to the Hearsay Rule

Finally, even if none of the aforementioned reasons applied, RUS's statement would be admissible under Federal Rule of Evidence 807(a), which provides:

> Under the following circumstances, a hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804:
>
> (1) the statement has equivalent circumstantial guarantees of trustworthiness;
>
> (2) it is offered as evidence of a material fact;
>
> (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and
>
> (4) admitting it will best serve the purposes of these rules and the interests of justice.

Rule 807 allows the Court to admit evidence that is "necessary, highly probative, and carrie[s] a guarantee of trustworthiness equivalent to or superior of that which underlies the other recognized exceptions" to the hearsay rule. United States. v. Thunder Horse, 370 F.3d 745, 747 (8th Cir. 2004) (citation omitted).

Four separate witnesses aver that RUS made the February 2 statement, and the statement was contemporaneously documented long before the litigation. The statement also is bolstered by earlier documentary evidence that RUS expressed concern about the BPA and that, after RUS received the BPA to review, it warned the County not to move forward while it was still reviewing the BPA. The fact that RUS refuses to provide testimony in this case shows that there is no other way to ascertain the truth of what occurred, and the admission of RUS's statement is vital to the determination of the claims in this case. ORIX has no evidence whatsoever that RUS did not make the claimed statement. Finally, the admission of the statement serves the general purposes of the rules of evidence and the interests of justice.

### 2. Documents and Testimony Repeating RUS's Statement

ORIX further argues that multiple documents and deposition testimony recounting RUS's statement are inadmissible because they contain hearsay within hearsay. The Court concludes that there is no hearsay within hearsay problem. First, as the Court has explained, RUS's statement is not inadmissible hearsay.

### a) Huddleston Email

The email from Lake County Administrator Matthew Huddleston to the broadband project working group on February 2, 2011, that summarizes for the working group the conference call with RUS held earlier that day (Second Huddleston Decl., Ex. 1) falls within the business records exception to the hearsay rule. Federal Rule of Evidence 803(6) provides:

> A record of an act, event, condition, opinion, or diagnosis [is not excluded by the rule against hearsay] if:
>
> (A) the record was made at or near the time by – or from information transmitted by – someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
>
> (E) neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness.

Huddleston participated in the RUS conference call and then wrote the email the same day, "just after the call." (Second Huddleston Decl. ¶ 3.) He wrote the email in the course of his regularly conducted duties as County Administrator, and writing emails to members of project groups was a regular

practice in his duties as County Administrator.  (Id.)  There is no indication that the email or its author are untrustworthy.  Thus, the email is admissible.

### b)      Letters from Skala to ORIX

On February 23, 2011, and April 15, 2011, Skala wrote letters to ORIX recounting RUS's statement.  Skala has firsthand knowledge of the contents of the RUS conference call, as a participant in that call, and she wrote the letters in the course of her regularly conducted duties as an attorney for the County. (Second Skala Decl. ¶2.)  Writing such letters is a regular practice in her duties as an attorney serving as bond counsel and there is no indication that the letter or Skala are untrustworthy.  (Id. ¶ 2.)  Moreover, the Skala letters are not hearsay because they are verbal acts – according to ORIX they constitute anticipatory repudiation.

### c)      Gasele Notes

Notes of the RUS conference call taken by the County's bond counsel, John Gasele, during the call itself (Gasele Decl., Ex. A), are admissible under the present sense impression exception to the hearsay rule for "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it."  Fed. R. Evid. 803(1).  See also United States v. Beck,

122 F.3d 676, 681-82 (8th Cir. 1997).  The notes describe the RUS conference call

and were made while Gasele listened to the call.  (Gasele Decl. ¶ 4.)

### d)    Deposition Testimony and Declarations

Deposition testimony and declarations recounting RUS's statement and

made by witnesses who participated in the conference call are clearly admissible.

### C.    Cross Motions for Summary Judgment

### 1.    Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine dispute as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  Celotex, 477 U.S. at 323.  "A dispute is genuine if the evidence is

such that it could cause a reasonable jury to return a verdict for either party; a

fact is material if its resolution affects the outcome of the case."  Amini v. City of

Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).

## 2.    Anticipatory Repudiation

ORIX asserts that Lake County anticipatorily breached the BPA. Anticipatory breach occurs "[w]here one party to an executory contract, before the performance is due, expressly renounces the same and gives notice that he will not perform it." <u>Space Center, Inc. v. 451 Corp.</u>, 298 N.W.2d 443, 450 (Minn. 1980) (citation omitted). If this happens, "his adversary, if he so elects, may treat the renouncement as a breach of the contract and at once bring an action for damages." <u>Id.</u> (citation omitted). However, "[t]he refusal to perform must in effect be an unqualified renunciation or repudiation of the contract. A mere refusal, not of that character, will not obviate the necessity of a tender." <u>Id.</u> (citation omitted).

Lake County admits that it expressly gave notice that it would not perform the BPA, but claims that its anticipatory breach should be excused because the conditions precedent to its performance set forth in § 4 of the BPA did not occur. Alternatively, it argues frustration of purpose excused its performance.

## 3.    Conditions Precedent

Defendants assert that condition precedents in § 4 of the BPA failed to occur, so Defendants' failure to perform under the BPA was not a breach. ORIX

retorts that ORIX had the power to waive the conditions precedent in Section 4. Alternatively, ORIX argues that the conditions precedent were satisfied.

It is clear that multiple § 4 conditions precedent were not satisfied, such that Defendant's obligation to perform did not accrue. However, the Court need not decide whether it must enforce the clear typographical error permitting ORIX to waive the conditions precedent in § 4. Even if the Court were to enforce this nonsensical clause, Defendants' performance would be excused by the frustration of purpose doctrine.

### 4. Frustration of Purpose

The Court holds that Defendants are entitled to summary judgment because the doctrine of frustration of purpose excused their performance under the BPA.[1]

### a) Legal Standard for Frustration of Purpose

---

[1] ORIX has not addressed the viability of its claims based on the termination fee under § 11. In any event, those claims fail. Section 11 provides: "In the event that the Borrower or Issuer terminates this Agreement to finance the Project with a lender or financial institution other than Purchaser, Borrower agrees to pay the Purchaser a termination fee equal to 10% of the stated principal amount of the Bonds." (Bond Purchase Agreement § 11.) The record establishes that Defendants did not terminate the BPA in order to finance the Project with another lender or financial institution. Rather, Lake County used its own money to finance the Project. Therefore, Section 11 does not apply.

Three conditions must be met for the defense of frustration of purpose to apply:

1. The party's principal purpose in making the contract is frustrated;

2. without that party's fault;

3. by the occurrence of an event, the non-occurrence of which was a basic assumption on which the contract was made.

City of Savage v. Formanek, 459 N.W.2d 173, 176 (Minn. Ct. App. 1990) (citation omitted). "The purpose that is frustrated must have been a principal purpose of the party claiming discharge. The principal purpose: [m]ust be so completely the basis of the contract that, as both parties understand, without it the transaction would make little sense." Id. (quoting Restatement (Second) of Contracts § 265, comment a (1981)). In determining the principal purpose of a contract, a court may consider both extrinsic evidence and the surrounding circumstances. Pieper, Inc. v. Land O'Lakes Farmland Feed, LLC, 390 F.3d 1062, 1066 (8th Cir. 2004). In this case, the BPA itself demonstrates that the principal purpose of the contract was frustrated, and extrinsic evidence further bolsters that conclusion.

> **b)** **Whether RUS Approval of the Final BPA Was a Basic Assumption of the Final BPA**

RUS's rejection of the BPA frustrated the BPA's only and principal purpose: to provide the requisite local match of funds necessary to obtain the

federal RUS loan and grant.  Section 1(a) of the BPA states: "Borrower intends to

finance the Project by borrowing an amount not to exceed $56,413,705 . . . from

the Government acting through RUS; the acceptance of a grant from the

Government, acting through RUS, in an amount not to exceed $9,955,359 . . .; and

by providing local matching funds in the amount of at least $3,500,000. . . ."  It

continues that "[t]he proceeds from the sale of the Bonds will be loaned to the

Borrower for the purpose of, together with other available funds, (i) financing a

portion of the cost of the Project not eligible to be paid from the RUS Loan or

RUS Grant; (ii) funding a debt service reserve fund to secure payment of the

Bonds; (iii) funding capitalized interest on the Bonds and the RUS Loan during

the construction period; and (iv) paying certain costs of issuance of the Bonds."

(BPA § 1(a).)  The Bonds will be secured by a lien on all property purchased with

the RUS Loan and Grant funds, including the revenues from the Project.  (Id. §

1(b).  The matching fund requirement of a $3,500,000 indenture "in form and

substance satisfactory to RUS," was a condition precedent mandated by RUS to

its approval of the loan and grant to the County.  (LGSA § 4.1(j); Schedule 1, Art.

IV(1)(a).)  More than 90% of the Project funding was coming from the federal

government, so it would make no sense to close the bond transaction if the

federal funding was not forthcoming, as ORIX's in-house counsel, Dinan, admitted. (Bayliss Decl., Ex. A, Dinan Dep. 50.) He repeatedly testified that, if RUS pulled funding from the Project, ORIX would not close on the BPA: "[I]f either the county or the federal government had walked away from the project, we [ORIX] would not have closed the bond purchase agreement." (Id. 50, 51, 66.)

Even foreseeable events can frustrate the purpose of a contract. City of Savage, 459 N.W.2d at 177. Here, the undisputed evidence is that the entire purpose of the BPA was to provide gap financing to enable the County to qualify for the RUS loan and grant to build the Project, the proceeds of which were to be used to repay the bonds. Once RUS stated that it would not approve the loan and grant and would end the Project if the County proceeded with the BPA, there was no purpose whatsoever for the BPA for either party. From the County's point of view, it would be issuing bonds to fund nothing because there would be no Project. (And in fact, it would not be able to legally issue bonds without a public purpose.) From ORIX's point of view, it would be purchasing bonds that had no chance of repayment because repayment was going to come from the revenue raised by the Project and no Project would exist. ORIX's in-house counsel testified multiple times that if RUS pulled out of the Project, ORIX

would not close on the BPA.  It would be absurd and futile to enforce the BPA in the face of RUS's rejection of the BPA.

This case is not like the cases relied upon by ORIX, in which third-party action made the disputed contract less profitable or more difficult for one of the contracting parties.  See Megan v. Updike Grain Corp., 94 F.2d 551, 554-55 (8th Cir. 1938); Metro. Sports Facilities Comm'n v. Gen. Mills, 460 N.W.2d 625, 628-29, 630 (Minn. Ct. App. 1990), aff'd 470 N.W.2d 118 (Minn. 1991).  Here, there is absolutely no purpose to the agreement after the action taken by the third-party government entity.

The fact that RUS did not formally reject the BPA, which would have required RUS to pull the award from the County altogether, is not dispositive.  It is enough that, in substance, RUS rejected the BPA.  See City of Savage, 459 N.W.2d at 177.

Additionally, the frustrating event – RUS's rejection of the BPA – was not the County's fault.  RUS is an independent federal agency.  There is no indication that the County had the ability or intent to influence RUS to reject the BPA.  See Viking Supply v. Nat'l Cart Co., 310 F.3d 1092, 1096-97 (8th Cir. 2002).

Because RUS rejected the BPA, the frustration of purpose doctrine applies, and ORIX's claim that Defendants breached the BPA must be rejected.

Accordingly, based upon the files, records, and proceedings herein**, IT IS HEREBY ORDERED**:

1. Plaintiff's Motion for Summary Judgment [Docket No. 61] is **DENIED**.

2. Defendants' Motion for Summary Judgment [Docket No 63] is **GRANTED** and this matter is **DISMISSED WITH PREJUDICE**.

3. Plaintiff's Motion to Partially Exclude Opinion Testimony of R. Donald Keysser and Prohibit Supplementation [Docket No. 75] is **DENIED AS MOOT**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: December 5, 2013            s/ Michael J. Davis
                                   Michael J. Davis
                                   Chief Judge
                                   United States District Court